UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
CONCETTA NYMAN,                )
      Plaintiff,               )
                               )
v.                             )     Civil Action No. 05-10412-JLT
                               )
FEDERAL RESERVE BANK           )
OF BOSTON,                     )
      Defendant.               )
_____)
```

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.      INTRODUCTION**

Plaintiff Concetta Nyman ("Nyman"), a former employee of the Defendant Federal Reserve Bank of Boston (the "Bank"), alleges that, from some unspecified time in 2001 until she left her job in April 2003, the Bank failed to provide an accommodation for her alleged disability, in violation of the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq.  Nyman's claim is without merit and should be dismissed because (1) Nyman did not exhaust her administrative remedies by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"); (2) Nyman's physical limitation -- a 10-pound lifting restriction -- does not constitute a "disability" covered by the ADA; and (3) the Bank accommodated Nyman by giving her a job that did not require her to lift more than 10 pounds.

**II.    PROCEDURAL HISTORY**

Nyman filed a charge of disability discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the EEOC on or about June 23, 2004. (Bickerton Aff. ¶ 2 Ex. 1). On August 24, 2004, the MCAD dismissed the charge on the grounds that it did not have jurisdiction over the Bank. (Bickerton Aff. ¶ 3 Ex. 2). Nyman filed this action on or about February 14, 2005. The Bank filed its Answer on April 25, 2005. The Bank has deposed Nyman and her treating physician. Nyman has not taken any depositions.

**III.   UNDISPUTED MATERIAL FACTS**

   A.    <u>Background of Nyman's Employment at the Bank</u>

The Bank is one of the twelve district Federal Reserve Banks in the Federal Reserve System with an office tower and secure facility in Boston. Nyman was employed by the Bank from 1968 until her discharge in April 2004. With the exception of a brief stint as a supervisor in the 1980's (a position from which she eventually was demoted), Nyman held various clerical positions in the Bank's Cash Services Department. (Nyman Dep. 10-11, 25, 29).

As of July 2000, Nyman was working as a Paying Teller. Her duties involved counting and reconciling large stacks of currency and required her to lift heavy bundles of currency and to push carts stacked with almost 1,000 pounds of notes. (Nyman Dep. 19-24, 33-34). That summer, Nyman developed a problem with her shoulders and was out of work starting July 31, 2000. Nyman filed a Worker's Compensation claim for her subsequent six-and-a-half month leave of absence. (Nyman Dep. 35-37). Pursuant to a generous sick leave and workers compensation policy, the Bank supplemented Nyman's Worker's Compensation payments to equal her full salary, with the result that she suffered no loss of income during her leave. (Bickerton Aff. ¶ 5).

B.   The Bank Accommodated Nyman's Lifting Restriction

Nyman's rheumatologist cleared her to return to work in February 2001 with the limitation that she could not lift more than 10 pounds or reach over her head. These restrictions precluded Nyman from performing her Paying Teller duties. (Nyman Dep. 37-40). Accordingly, the Bank assigned her to work as a High Speed Currency Operator, where she could work with currency in smaller units that would not require her to lift more than 10 pounds. (Bosco Aff. ¶ 3). In her new role, Nyman prepared currency to be machine-sorted by removing rubber bands from straps of currency weighing 2.25 pounds and placing the notes in 2-ounce packets into the high speed sorting machine. After the bills were sorted, and the torn, defaced or suspected counterfeit bills shredded by the machine, Nyman removed the remaining bills and returned them to containers in the same size packets they had arrived in. (Nyman Dep. 13-16; Bosco Aff. ¶ 2). Nyman acknowledges that her duties as a High Speed Currency Operator did not require her to exceed her lifting restriction. (Nyman Dep. 38, 41).

Nyman continued to work under the same 10-pound and over-the-head lifting restrictions from February 2001 until early 2003. (Nyman Dep. 43). Nyman submitted periodic renewals of her lifting restriction to the Bank's Health Services Unit, which documented her continued assignment to light duty. (Manning Aff. ¶¶ 2,3 4 Ex. 1). On March 19, 2003, Nyman updated her light duty request with essentially these same restrictions. (Manning Aff. Ex. 1). Despite the fact that Nyman's physical limitations had not changed over the past two years (Nyman Dep. 42), she went out on sick leave on April 2, 2003 and never returned. (Nyman Dep. 9, 65).

Nyman's primary care physician had never treated her for her shoulder condition (and had not treated any other patient for that condition within the past 10 years), had never tested Nyman's lifting ability and did not even know what Nyman's work duties consisted of.

-3-

Nonetheless, Nyman told him in September 2003 that she was totally and permanently disabled from working in her Bank job or any other, and he made that finding in his records. (Singer Dep. 18, 20-23, 25, 32, 38, 61-64, 81-82, 86). Nyman then filed a claim for benefits under the Bank's long-term disability ("LTD") insurance plan. (Nyman Dep. 69-72; Bickerton Aff. ¶ 6). Nyman's claim was denied on December 2003 by Liberty Mutual, then the Bank's LTD insurer. (Bickerton Aff. ¶7 Ex. 4). Nyman appealed the denial of her claim.

The Bank has a policy prohibiting sick leaves of longer than one year. Under this policy, Nyman would have had to return to work by April 3, 2004 or her employment would have terminated. (Bickerton Aff. ¶ 4, 8 and Ex. 3). The Bank paid Nyman her full salary for the first six months of her absence and decided to continued to pay Nyman her full salary using her accrued sick leave through April 3, 2004, while her appeal was pending. (Nyman Dep. 72-73; Bickerton Aff. ¶ 7). Notwithstanding its sick leave policy, the Bank also decided on April 3, 2004 to continue Nyman's employment and place her on an unpaid leave of absence until her LTD appeal was decided. (Bickerton Aff. ¶ 9). Nyman's LTD appeal was denied on May 4, 2004. (Bickerton Aff. ¶ 10 Ex. 5). Because Nyman did not return to work at that time, the Bank discharged her.[1] (Bickerton Aff. ¶ 11). Nyman acknowledges that she has incurred no loss of income through the date of her termination and has no unpaid medical bills.[2] (Nyman Dep. 77).

---

[1] Nyman does not allege that her discharge was unlawful.

[2] Nyman has had no treatment for her shoulders since September 2003, takes no medication, no longer consults with a rheumatologist and has not followed up on a recommended course of physical therapy. (Nyman Dep. 77-80). In 2005, Nyman filed a claim for Worker's Compensation benefits which was settled by the payment to her of a lump sum. (Nyman Dep. 74). She currently receives Supplemental Security Disability Income from the federal government and retirement income and medical benefits from the Bank. (Nyman Dep. 75, 115-116). At her deposition, she stated her intent to sue the Bank's LTD carrier for denying her claim. (Nyman Dep. 116-117).

## IV.    ARGUMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  To defeat summary judgment, the plaintiff "must establish at least a genuine issue of material fact on every element essential to [her] case in chief."  Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993), quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991).  Moreover, those factual disputes "must herald the existence of 'definite, competent evidence;'" "[o]ptimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."  Vega, 3 F.3d at 479, quoting Mesnick, 950 F.2d at 822; Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

There is no dispute that Nyman filed her EEOC charge more than 15 months after she left work and any obligation that the Bank had to accommodate her had ended.  Accordingly, her claim is barred by the 180-day statute of limitations under the ADA.  In any event, Nyman has offered no evidence sufficient to find that her lifting restriction by itself was a "disability" that even entitled her to protection under the ADA or that, assuming the Bank had an obligation to accommodate her, it failed to do so.

### A.    Nyman's Claim Is Time-Barred

As a prerequisite to filing a civil action under the ADA, a plaintiff must have timely filed a charge of discrimination with the EEOC and have received and acted upon notification from the EEOC of her right to sue.  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).  The ADA imports the

procedural requirements of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-1 et seq. See 42 U.S.C. § 12117(a). Section 2000e-5(e)(1) of Title VII provides that

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto . . . , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

The Bank is an instrumentality of the federal government, Fed. Reserve Bank of Boston v. Comm'r of Corps. & Taxation, 499 F.2d 60, 62 (1st Cir. 1974), vacated on other grounds, 520 F.2d 221 (1st Cir. 1975), and the regulation of its employment practices therefore is outside the scope of state discrimination laws. See 12 U.S.C. §341; Bollow v. Fed. Reserve Bank of San Francisco, 650 F.2d 1093 (9th Cir. 1981); Ana Leon T. v. Fed. Reserve Bank of Chicago, 823 F.2d 928, 931 (6th Cir. 1987); Osei-Bonsu v. Fed. Home Loan Bank of N.Y., 726 F. Supp. 95, 98 (S.D.N.Y. 1989) (interpreting identical preemptive language in 12 U.S.C. §1421). For this reason, the MCAD declined to exercise jurisdiction over Nyman's charge of discrimination.[3] (See Bickerton Aff. Ex. 3). Because no state agency has authority to grant relief to Nyman, the appropriate limitations period applicable to her claim was 180 days.

The 180-day statute of limitations on Nyman's claim began to run on April 2, 2003 when she left work claiming to be totally disabled from performing her job. The ADA protects only "qualified" disabled individuals; that is, individuals who are able to perform the essential functions of their positions either with or without an accommodation. 42 U.S.C. § 12112(b)(5)(A)(2000); Calef v. Gillette Co., 322 F.3d 75, 86 n.8 (1st Cir. 2003). Accordingly,

---

[3] The MCAD has routinely dismissed claims filed by other Bank employees on the same grounds. See, e.g., McBride v. Federal Reserve Bank of Boston, MCAD Docket No. 02-BEM-00554 (March 11, 2002); Nackley v. Federal Reserve Bank of Boston, MCAD Docket No. 98-BEM-3717 (February 2, 1997).

Nyman no longer was covered by the ADA as of April 2, 2003, and any obligation that the Bank may have had to accommodate her ended on that date.  See Calef, Id., ("If the plaintiff . . . cannot perform an essential function of the job, then he is not a qualified individual [under the ADA] and there is no duty to accommodate.").  Nyman did not file her charge until June 2004, more than 14 months after she left work.  Nyman's EEOC charge was untimely, and her claim in this Court is barred.

> B.  Nyman's Accommodation Claim Has No Merit Because She Was Not Disabled Within the Meaning of the ADA and The Bank Observed Her Medical Restrictions

Even if reviewed on its merits, Nyman's accommodation claim would fail due to her inability to adduce any supporting evidence.  Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified employee with a disability unless doing so would cause an undue hardship to the employer.  See 42 U.S.C. § 12112(b)(5)(A)(2000); Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100 (1st Cir. 2005).  To survive summary judgment on her reasonable accommodation claim, Nyman must produce evidence for a reasonable jury to find that (1) she was disabled within the meaning of the ADA, (2) she was able to perform the essential functions of her job with or without a reasonable accommodation, and (3) the Bank, despite knowing of her disability, did not reasonably accommodate it.  See Tobin at 107, citing Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 63 (1st Cir. 2004).  Although the second element of Nyman's case is not in dispute, she does not have a shred of factual or legal support for the other elements.

> 1.  Nyman's Lifting Restriction Is Not A Disability Under the ADA

Nyman has a condition that has been identified at various times in her medical records as "frozen shoulder syndrome" and "adhesive capsulitis."  Her primary care physician described

-7-

these as interchangeable names for a condition that causes pain and stiffness and limits the range of motion in the shoulders. (Singer Dep. 19-20; 99; 101). Nyman testified that her condition limits her daily activities in that she cannot style her hair with a blow dryer, lift her arms over her head for more than five minutes at a time, lift a case of water, do heavy cleaning or move furniture. Despite these relatively minor inconveniences, Nyman can bathe and dress herself, cook, shop, do light house cleaning, take out the trash, drive, watch TV, run errands and engage in social activities outside the house. (Nyman Dep. 88-91). Under well-established case law, the relatively minor limitations that Nyman's condition imposes on her daily activities do not constitute a disability under the ADA.

The mere existence of an impairment does not render an individual "disabled" under the ADA. Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 239 (1st Cir. 2001). To establish that she is disabled within the meaning of the ADA, an individual must prove that she has a physical or mental impairment that substantially limits one or more of the major life activities she engages in.[4] 42 U.S.C. § 12102(2)(A); See Bryant v. Caritas Norwood Hosp., 345 F. Supp. 2d 155, 163 (D. Mass. 2004). The regulations promulgated by the EEOC under the ADA define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(2)(i). A "substantial" limitation cannot include any impairment which interferes "in only a minor way with the performance of manual tasks" but, rather, must prevent or severely restrict the individual from doing activities that are of central importance to most people's daily lives. Gillen v. Fallon

---

[4] An ADA plaintiff also can establish that she is disabled by showing that she has a record of such an impairment or is regarded by her employer as having such an impairment. Id. Nyman does make either of these claims.

Ambulance Service, Inc., 283 F.3d 11, 21 (1st Cir. 2002), quoting Toyota Motor Mfg. V. Williams, 534 U.S. 184, 193 (2002).

The First Circuit has recognized that lifting is a major life activity. See, e.g., Gillen at 21. However, it is well settled that a general lifting restriction imposed by a physician, or the inability to do heavy lifting, do not by themselves constitute a substantial limitation on a major life activity and, therefore, do not constitute a disability within the meaning of the ADA. See, e.g., Bryant, 345 F. Supp. 2d at 164; Gillen, 283 F.3d at 18; Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997). This holding is grounded in the fact that "if a restriction on heavy lifting were considered a substantial limitation on a major life activity, then the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape. Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some particularly difficult manual task.". Camacho-Rodriguez v. Potter, Civ. No. 02-2797 (JAF); 2003 U.S. Dist. LEXIS 26800 (D.P.R. Dec. 5, 2003), aff'd, 2005 U.S. App. LEXIS 10312 (2005).

The Circuits that have ruled on more specific lifting restrictions uniformly have held that the inability to lift as little at 10 or 15 pounds does not "substantially limit" any major life activity. See, e.g., Blackwell v. City of Phila., No. 99-0015, 2000 WL 572706 (E.D. Pa. May 10, 2000)(carpal tunnel syndrome not substantially limiting where plaintiff could care for herself and lift and carry up to 10 pounds and use her hands for non-repetitive actions); Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996)(25-pound lifting restriction "particularly when compared to an average person's abilities" does not substantially limit the ability to lift, work or any other major life activity); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996)(employee who can "lift and reach as long as he avoids heavy lifting" not substantially

limited in a major life activity); Dutcher v. Ingalls Shipbuilding, 53 F.3d 723 (5th Cir. 1995); Khan v. Cook County, No. 96 C 1113; 1997 WL 370199 (N.D. Ill. Jun. 27, 1997)(15-pound lifting restriction and limitation on other manual tasks such as writing for longer than 20 minutes and tying shoes not substantially limiting); (Nuzum v. Ozark Auto. Distrib., 432 F.3d 839, 841 (8th Cir. 2005)(ability to lift 10 pounds constantly, 20 pounds frequently and 40 pounds occasionally not substantially limiting); Mellon v. Fed. Express Corp., 239 F.3d 954, 957 (8th Cir. 2001)(inability to lift more than 15 pounds and need to avoid other stressors with right arm not substantially limiting); Wooten v. Farmland Foods, 58 F.3d 382 (8th Cir. 1995)(ability to lift 10 pounds frequently and 20 pounds maximum not substantially limiting); Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 616-17 (8th Cir. 1997)(10-pound lifting restriction and inability to perform repetitive motions does not substantially limit major life activity of working).

The facts in Dutcher and Nuzum are strikingly similar to those presented here. In Dutcher, the plaintiff had seriously injured her right arm and, as a result, had difficulty picking up small objects from the floor, holding things above her head for long periods of time or turning on the car ignition, doing heavy lifting or repetitive rotational movements. However, because she could feed and groom herself, drive a car, carry groceries, wash dishes, vacuum and pick up trash, the Court held that she was not substantially limited in a major life activity and, therefore, not disabled. 53 F.3d at 726. Similarly, the plaintiff in Nuzum was given a lifting restriction by his physician and testified that he could not mow the lawn, work on cars, perform some household chores such as lifting a laundry basket, or throw a ball as well as he used to. The Court found, however, that he was not substantially limited in any major life activity because he still could do basic household chores, wash laundry and dishes, and pick up after his children. 432 F.3d at 847. The plaintiff in Toyota avoided sweeping, occasionally sought help dressing,

{B0472228; 3}

reduced the time she spent playing with her children, and minimized long distance driving, but was nonetheless able to brush her teeth, wash her face, bathe, fix breakfast, and pick up around the house. In concluding that she was not "substantially limited" in performing manual tasks and, therefore, not disabled, the United States Supreme Court found that "these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 202. Nyman's minor limitations and the broad range of daily activities that she can perform despite her condition are virtually the same as Dutcher, Nuzum and the other cited plaintiffs who were found not to be "disabled" under the ADA.

        2.       <u>The Bank Provided Nyman With The Only Accommodation She Needed</u>

Apart from the fact that Nyman's minimal limitations do not constitute a "disability" under the ADA, her claim fails because, by her own admission, the Bank provided her with the only accommodation that she medically required. During the time period at issue, the only accommodation that Nyman ever requested of the Bank on the advice of any doctor was to be relieved from lifting more than 10 pounds or reaching over her head. The Bank provided Nyman with this accommodation by placing her in the High Speed area, where she admittedly only handled bundles of currency well under 3 pounds. The Bank's scrupulous observance of Nyman's restriction was monitored periodically and documented by its own staff nurse, Maureen Manning. Even Nyman admits that her job duties were consistent with her medical restrictions.

Despite Nyman's admission and the Bank's documentation of her accommodation, Nyman testified at her deposition that, at some unspecified time after she returned to work in February 2001, the Bank stopped accommodating her in two ways.

-11-

First, Nyman testified that, as she stacked the sorted straps of currency on the cart on which they would be returned to the vault, she was required to reach above her shoulders in order to stack the top two rows. Nyman also testified that, between one and three times a day, she was required to push a fully loaded cart into or out of her work area. (Nyman Dep. 66-61). At the same time, however, Nyman admitted that she had never performed either of these tasks at the request or direction of any Bank manager. To the contrary, she acknowledged that, to the extent she had performed these tasks, she had done so voluntarily because she felt "guilty" asking her co-workers to assist her and, therefore, had chosen not to:

> Q: And you did not ask anyone else to help you with that part of your job?
>
> A: No, I didn't.
>
> Q: And that's because you felt guilty?
>
> A: Well, it was putting stress on my teammates.
>
> Q: So you felt guilty?
>
> A: Correct.
>
> Q: That's why you didn't ask someone to help you with the things that your doctor told you not to do?
>
> A: Correct.

(Nyman Dep. 48-51, 61). In addition to refusing to ask her co-workers for assistance, Nyman further admitted that she had never told her manager, Joseph Bosco that she needed someone to push the carts and, when her supervisor, Peggy McFarland, supervised her in counting money, she never told McFarland that she could not lift anything above her head. (Nyman Dep. 49-50, 53).

It is axiomatic that an employee shares with her employer some of the obligation to attend to her own medical needs. See, e.g., 29 C.F.R. § 1630.9(d) (stating that if an "individual

-12-

{B0472228; 3}

rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability"); Reed v. LaPage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001). The plaintiff in Reed alleged that she had a mental illness that caused her to lose control of herself emotionally and that she had requested that her employer accommodate her by allowing her to walk away from stressful situations. When Reed got into a heated discussion with her supervisor and a human resources manager, however, she did not walk away and instead verbally abused and physically threatened the manager. After her termination, she alleged that her employer had not provided her with the requested accommodation. The First Circuit Court of Appeals ultimately ruled that Reed had not adequately put her employer on notice of her disability or her need for a special accommodation. However, the Court concluded that "even had Reed made [the employer] so aware, and had she subsequently been granted an accommodation permitting her to walk away not only from conflicts with co-workers but also from conflicts with supervisors, she was never prevented from invoking any such accommodation during her fateful meeting in June of 1996. These grounds suffice to dispose of her case." Id. At 260. Here, there is no dispute that Nyman requested and <u>was granted</u> an accommodation for her lifting restriction and that any failure to invoke the accommodation was solely of her own doing. Nyman cannot hold the Bank responsible for her admitted refusal to avail herself of the proffered accommodation.

Second, Nyman alleges in her Complaint that the Bank failed to accommodate her when Manning told her in February 2003 that she, Nyman, should be assigned to work "with at least

three other people"[5] and Bosco subsequently told her that he could not guarantee any particular staffing level.[6] (Complaint ¶ 10). Nyman's claim here is simply a red herring. For one thing, at the time Nyman had this conversation with Manning, the Bank already was staffing the High Speed area in the way Nyman requested. In that regard, the Bank's staffing records for the first quarter of 2003 reflect that, on every single day but two that Nyman worked in the quarter, she actually was assigned to work with two or three others.[7] (Bosco Aff. Ex. 1).

For another thing, the staffing arrangement that Nyman claims she was entitled to was not a "reasonable" accommodation. To be "reasonable," an accommodation must "enable a qualified individual with a disability to perform the essential functions of the position." 29 C.F.R. § 1630.2(o)(2). In other words, the accommodation must be related to the employee's particular work limitation, because "[a]n *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 400-402 (2002); see also Tobin, 433 F.3d at 110, citing with approval Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003)("[w]here the reasonable accommodation requested is unrelated to the limitation, we do not believe an ADA action may lie."). These holdings are consistent with the very purpose of the ADA, which is "to provide a disabled employee with a

---

[5] At her deposition, Nyman modified this to claim that Manning had said that she should be assigned to work in a "group of three." (Nyman Dep. 47).

[6] Manning had never treated Nyman for her shoulder condition and disputes that she recommended any particular staffing level to Nyman. Rather, Manning testified that Nyman complained to her about being assigned with only one other employee and Manning merely repeated Nyman's staffing request in her notes. (Manning Aff. ¶ 5). This issue is not material to the case because, as discussed *infra*, the staffing level in Nyman's work area was irrelevant to her ability to lift and, therefore, any accommodation that consisted of a particular staffing guarantee would not have been "reasonable."

[7] One of the two days that Nyman was assigned with just one other employee was Chinese New Year, a day that many of the Bank's numerous Asian employees take as vacation and on which the Bank traditionally is short-staffed. (Bosco Aff. ¶ 5).

reasonable accommodation that will help the employee overcome the limitation caused by his or her particular disability; it is not a statute intended to provide benefits to an employee simply because the employee happens to be disabled. <u>Tobin</u>, 433 F.3d at 110, <u>citing</u> <u>Felix v. N.Y. City Transit Auth.</u>, 324 F.3d 102, 107 (2d Cir. 2003).

None of Nyman's treating doctors ever recommended that the Bank staff its operations at any particular level and Nyman has no medical evidence -- and certainly never presented any to the Bank -- that the staffing levels in her work area would have mitigated or even related to her own physical limitations in any way. Bosco correctly believed that the number of people assigned to the High Speed area would not have any effect whatsoever on Nyman's ability to lift or do her job. Any obligation that the Bank had to accommodate Nyman was fully satisfied by placing her in a position where she was not required to exceed her lifting restriction. The Bank already had been doing this for two full years before Nyman complained about staffing. Accordingly, when Nyman asked Bosco for more staff, he told her to simply do whatever tasks she could. (Bosco Aff. ¶ 4). To the extent that Nyman exceeded her restrictions, she did so voluntarily out of her own unwillingness to ask for help. No number of co-workers would have made a difference to Nyman's limitations.

In addition to accommodating Nyman's lifting restriction, the Bank gave Nyman several extended leaves of absence, with no limitations or penalties. Indeed, Nyman acknowledged that she was given salary increases even in years during which she had extended absences related to her medical condition. (Nyman Dep. 59). In addition, the Bank waived application of its sick leave policy and extended Nyman's employment until the final determination of her LTD claim. The Bank therefore fully satisfied whatever obligation it may have had under the ADA to accommodate Nyman's condition.

{B0472228; 3}

## V. CONCLUSION

For all of the foregoing reasons, the Defendant Federal Reserve Bank of Boston requests that the Court allow its motion for summary judgment and enter a judgment in its favor.

Respectfully submitted,

FEDERAL RESERVE BANK OF BOSTON,

By its attorneys,

/s/ Ilene Robinson Sunshine
Ilene Robinson Sunshine
BBO # 423000
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA  02109
(617) 338-2800
isunshine@sandw.com

Dated:  May 15, 2006

### Certificate of Service

I hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non registered participants
on May 15, 2006.

/s/ Ilene Robinson Sunshine

{B0472228; 3}